UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
In re:

INTERNATIONAL TOBACCO PARTNERS, LTD.,          Case No.: 10-74894-ast
                                             Chapter 11
                     Debtor.
---------------------------------------------------------------------X
INTERNATIONAL TOBACCO PARTNERS, LTD.,

                   Plaintiff,

   - against -                            Adv. Pro. No.: 10-9007-ast

UNITED STATES DEPARTMENT OF AGRICULTURE
and THOMAS VILSACK as SECRETARY OF THE
UNITED STATES DEPARTMENT OF AGRICULTURE,

                   Defendants.
---------------------------------------------------------------------X

## MEMORANDUM OPINION ON CROSS MOTIONS
## FOR SUMMARY JUDGMENT

      Benjamin Franklin once wrote that "in this world nothing can be said to be certain, except death and taxes."[1] This case demonstrates that what constitutes a tax is not always certain.

      Before the Court are cross motions for summary judgment (the "Motions") filed by the Plaintiff/Debtor, International Tobacco Partners, Ltd. (the "Debtor"), and the Defendant, the United States Department of Agriculture (the "USDA").  Resolution of these Motions turns on the following three issues:

   1.  Whether quarterly assessments owed by an importer of tobacco products, such as Debtor,

       under a federal program designed to wean U.S. tobacco growers off their dependence on

       government subsidies and price controls constitute excise taxes for purposes of federal law;

---

[1] Letter from Benjamin Franklin to Jean-Baptiste Leroy (Nov. 13, 1789), *as reprinted in* EUGENE GERHART, QUOTE IT COMPLETELY 263 (1998).

2.  If those assessments constitute excise taxes, when do then accrue; and

3.  Whether quarterly assessments that cover both pre- and postpetition periods are entitled to priority status under Bankruptcy Code[2] § 507(a)(8)(E)(ii) for the prepetition portion and to administrative claim status under § 503(B)(1)(B) for the postpetition portion.

For the reason set forth below, this Court holds that the assessments imposed against Debtor constitute excise taxes that accrue quarterly; that USDA's claim for prepetition assessments shall be treated as a priority claim under § 507(a)(8)(E)(ii) for amounts that accrued during the three-year period prior to the filing of the Debtor's petition, and as an unsecured claim for assessments that accrued more than three years prior to the petition date; and that USDA is entitled to file an administrative claim under § 503(b)(1)(B) for assessments that accrue postpetition.

## Jurisdiction

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (B), (I), and (O), and the Standing Order of Reference in effect in the Eastern District of New York dated August 28, 1986.  This memorandum opinion constitutes the Court's findings of facts and conclusions of law to the extent Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") so requires.  FED. R. BANKR. P. 7052.

## Facts and Background[3]

*Fair and Equitable Tobacco Reform Act*

In October 2004, as part of the American Jobs Creation Act, Congress passed the federal Fair and Equitable Tobacco Reform Act of 2004 ("FETRA").[4]  *See* Pub. L. No. 108-357, Title

---

[2]  References to the Bankruptcy Code are to 11 U.S.C. § 101, *et seq.*

[3]  The following undisputed facts are drawn from the parties' Rule 7056 Statements and the pleadings.

[4]  In its pleadings, the Debtor refers to this legislation as the "Tobacco Bailout Bill ("TBB")." For consistency with other published decisions, this Memorandum Opinion only uses the acronym "FETRA."

VI, § 643, 118 Stat. 1536 (Oct. 22, 2004) (codified at 7 U.S.C. § 518, *et seq.*).  Through FETRA,

Congress sought to wean domestic tobacco farmers and producers (the "U.S. Tobacco Growers")

off their dependence upon a system of quotas, price controls and subsidies enacted during the

Great Depression, and transition them to a system of free market pricing and competition.  *See*

150 Cong. Rec. H8704-03, at *H8717-18, 2004 WL 2266992 (Oct. 7, 2004).  Out of a concern

that U.S. Tobacco Growers were at a competitive disadvantage, and to facilitate this transition,

FETRA tasked the Commodity Credit Corporation ("CCC"), a government-owned corporation

that operates under the auspices of USDA, with overseeing a ten-year program under which U.S.

Tobacco Growers would receive annual payments (the "Tobacco Transition Payment Program").

These payments were designed by Congress to be revenue neutral; that is, instead of being direct

government subsidies, payments were to be generated by redistributions of assessments levied

against all domestic manufacturers of tobacco products and importers of foreign-produced

tobacco (together the "Tobacco Manufacturers").  According to USDA, there are approximately

450,000 U.S. Tobacco Growers that receive annual payments under the Tobacco Transition

Payment Program.  *See* Declaration of Joy Harwood, Director of the Economic and Policy

Analysis Staff, Farm Service Agency, USDA at ¶ 7 (the "Harwood Declaration").  [dkt item 18]

The annual payments are made from a Tobacco Trust Fund, which is supposed to be funded

through the quarterly assessments collected by CCC from the Tobacco Manufacturers (the

"Assessments").  According to the legislative history, FETRA essentially operates as a "buyout"

of U.S. Tobacco Growers by providing them with payments for ten years during which time

Congress anticipated that U.S. Tobacco Growers would either become more competitive with the

free market or would transition to new crops or would move to entirely different means of

earning a living.  *See* 150 Cong. Rec. H8704-03, at *H8717-18.

The program was designed to run from fiscal year 2005 to fiscal year 2014.  Congress determined that the total amount to be distributed to U.S. Tobacco Growers under FETRA would be capped at $10.14 billion over the ten years.  7 U.S.C. § 518f.  This $10.14 billion is also the amount that would be assessed against and collected from Tobacco Manufacturers under FETRA.  Each Tobacco Manufacturer's individual Assessment would be calculated quarterly by CCC to determine that Tobacco Manufacturer's share of the aggregate assessment to be collected in that quarter.[5] 7 U.S.C. § 518d(b).

FETRA established a two-step process for calculating each Tobacco Manufacturer's quarterly Assessment.  In "Step A," the total amount required to fund the Tobacco Transition Payment Program ($10.14 billion) is allocated among six classes of tobacco products:  cigarettes, cigars, snuff, roll-your-own, chewing, and pipe.  7 U.S.C. § 518d(c)(1).  For fiscal year 2005, FETRA set the allocation among these classes at specific percentages.  *Id.*  For the nine fiscal years thereafter, CCC makes an annual allocation based upon each class's share of the total U.S. market in tobacco products.  § 518d(c)(2); 7 C.F.R. §§ 1463.4, 1463.5.  In "Step B," each Tobacco Manufacturer's individual Assessment is calculated pro rata based upon that Tobacco Manufacturer's share of the "gross domestic volume"[6] of tobacco products that were "removed" in a prior quarter, meaning either taken out of domestic inventory or, for imported products such

---

[5] Each Tobacco Manufacturer's individual Assessment is not a linear calculation; that is, the amount to be paid is not a direct result of a fee or a charge assessed per pound, per ton, or per cigarette. Rather, each Tobacco Manufacturer's Assessment is a pro-rated portion of the gross amount Congress sought to collect each year though the quarterly Assessments. However, it does not appear that the gross amount that is assessed each year directly parallels, or was intended to parallel, the amount that CCC actually pays to U.S. Tobacco Growers each year.

[6] "Gross domestic volume" means the volume of tobacco products that were "removed" and not exempt from tax under 26 U.S.C. §§ 5701, *et seq*. 7 U.S.C. § 518d(a)(2). The gross domestic volume of cigarettes or cigars is measured by the number of cigarette or cigar sticks that are taken from inventory or released from customs in a given year, and the gross domestic volume of other tobacco products is measured in pounds. § 518d(g)(3); *see Swisher Int'l, Inc. v. Mike Johanns, Sec'y of Agric.*, 2007 WL 4200816, at *2 (M.D. Fla. Nov. 27, 2007); USDA Memorandum of Law at 6. [dkt item 17]

as in this case, released from customs and made available for marketing in the United States.[7]

CCC makes the Step B calculation based upon information collected from Tobacco

Manufacturers regarding their market share for that tobacco product.  The final determination of

each Tobacco Manufacturer's quarterly Assessment is calculated by multiplying its share of the

gross domestic volume of tobacco products within a class as determined under Step B by the

Assessment amount for that particular class of tobacco products as determined under Step A.[8]

§ 518d(f).  After the end of each quarter, CCC sends out Assessment notices, or invoices, to all

Tobacco Manufacturers covering the previous quarter.[9]

     FETRA requires that CCC impose an Assessment on each Tobacco Manufacturer that

"sells tobacco products in domestic commerce in the United States during that fiscal year."

§ 518d(b)(1).  Therefore, a Tobacco Manufacturer can only avoid liability for quarterly

Assessments by not selling tobacco products in U.S. domestic commerce during a given year.[10]

     If a Tobacco Manufacturer fails to pay its quarterly Assessments, the regulations direct

CCC to assess interest on any unpaid Assessments at the interest rates that CCC otherwise

---

[7] *See United States v. Native Wholesale Supply Co.*, 2011 WL 4704221, at *2 n.3 (W.D.N.Y. Oct. 04, 2011); *Swisher*, 2007 WL 4200816, at *2; *see also* 7 U.S.C. § 518d(b); 26 U.S.C. § 5702(j).

[8] The Harwood Declaration provides the following example of the two-step calculation:

> [A]ssume that the cost for a fiscal year quarter of the [Tobacco Transition Payment Program] was $10 million, and assume that cigarette manufacturers would, as a class, have to pay 75% of that amount, or $7.5 million. If a particular cigarette manufacturer had 50% of domestic sales within the cigarette class, then that manufacturer would owe $3.75 million (50% of $7.5 million). In this example, 75% would be the Step A percentage for cigarettes as a class, and 50% would be the Step B determination for that company.  The end result of $3.75 million is the same as multiplying the company's Step B percentage times the relevant Step A class percentage times the total all-class assessment (.50 x .75 x $10 million).

Harwood Declaration at ¶ 13. [dkt item 18]

[9] For example, in May or June 2012, CCC will send out invoices for the January to March quarter of fiscal year 2012. *See* USDA Memorandum of Law at 6. [dkt item 17]

[10] If a Tobacco Manufacturer wants to challenge an Assessment, it must do so within 30 business days of receiving the Assessment invoice through an agency appeals process. § 518(d)(i). Once a challenger has exhausted the agency appeals process, it may seek judicial review of an Assessment under § 518(d)(j).

assesses for delinquent debts.[11]  The regulations also impose civil and criminal penalties on a party that knowingly fails to provide information or that provides false information that is required to be reported under the regulations.  7 C.F.R. § 1463.10.  However, it appears that the payments to U.S. Tobacco Growers are not impacted by the payment or nonpayment of Assessments; that is, Congress committed to paying out $10.14 billion to U.S. Tobacco Growers regardless of the amount of Assessments actually collected from Tobacco Manufacturers.

*Procedural History of Debtor's Bankruptcy Case*
*and This Adversary Proceeding*

Debtor filed a petition under Chapter 11 of the Bankruptcy Code on June 25, 2010 (the "Petition Date").  [main case 10-74894-ast, dkt item 1]  According to the petition, Debtor is a Tobacco Manufacturer and is engaged in the business of importing discount and generic cigarettes and cigars and selling them throughout the United States through a network of distributors.

On July 19, 2010, USDA filed proof of claim number 3 (the "USDA Claim") asserting a priority claim in the amount of $1,297,215.90 reflecting "Unpaid Assessments due in accordance with 7 U.S.C. 518d."  Annexed to the USDA Claim is a schedule of quarterly Assessments for each quarter beginning with the first quarter of fiscal year 2005 and ending with the May 31, 2010, which was the month ending prior to the Petition Date.

On December 16, 2010, Debtor commenced the instant adversary proceeding by filing a complaint (the "Complaint") [dkt item 1], which is essentially an objection to the USDA Claim, and which seeks declaratory relief as follows: first, that amounts owed by Debtor to USDA under FETRA are not a tax because FETRA lacks a public purpose; second, if the amounts owed by

---

[11]  *See* 7 C.F.R. § 1403.9(c) ("The late payment interest rate shall be equal to the higher of the Treasury Department's current value of funds rate or the rate of interest assessed under the Prompt Payment Act . . . .).

Debtor to USDA under FETRA are taxes, then they should be deemed excise taxes under

11 U.S.C. § 507(a)(8)(E), which Debtor alleges limits the priority status of excise taxes to

transactions occurring during the three years immediately preceding the Petition Date; third, that

postpetition FETRA Assessments should not be accorded administrative status under § 503(b)(1)

because the Assessments do not benefit the estate and because the Assessments were fixed on the

date that FETRA became effective  "on March 30, 2005"; and fourth, if FETRA Assessments are

found to be excise taxes under § 507(a)(8), then they are disqualified from postpetition

administrative status pursuant to § 503(b)(1)(B)(i).

On February 15, 2011, USDA filed an answer to the Complaint denying the allegations in

the Complaint and asserting as an affirmative defense that the Complaint fails to state a claim

upon which relief can be granted.  [dkt item 2]

Following hearings held on May 11, 2011 and August 24, 2011, the parties agreed that

this adversary proceeding did not involve any genuine issues of material fact and could be

resolved on cross motions for summary judgment.

On November 30, 2011, USDA moved for summary judgment (the "USDA Motion").

[dkt item 16]  The USDA Motion was accompanied by a memorandum of law (the "USDA

Memorandum of Law") [dkt item 17]; the Harwood Declaration [dkt item 18]; and USDA's

Local Bankruptcy Rule 7056-1 statement of undisputed facts [dkt item 22].  The USDA Motion

asserts that its Claim represents a priority claim for prepetition excise taxes under

§ 507(a)(8)(E)(ii), but concedes that Assessments which accrued more than three years prior to

the Petition Date are not entitled to priority status.  USDA Memorandum of Law at 18-19. [dkt

item 17]  USDA asserts that under applicable case law discussed below, the only question

regarding whether FETRA Assessments constitute excise taxes is whether there is a public

purpose underlying FETRA. *Id.* at 10.  In addition, USDA argues that any Assessments that

arise postpetition should be treated as administrative expenses under § 503(b)(1)(B). *Id.* at 19-21.

Also on November 30, 2011, Debtor cross moved for summary judgment ("Debtor's

Motion"), and filed a memorandum of law ("Debtor Memorandum of Law") and its Local

Bankruptcy Rule 7056-1 statement of undisputed facts. [dkt item 19]  Debtor argues that FETRA

Assessments are regulatory fees and not taxes or excise taxes because FETRA Assessments

serve no public purpose.  According to Debtor, the Assessments "were created by the United

States Department of Agriculture, a governmental agency, to benefit tobacco farmers, a

particular party in interest, and not the General Public.  The benefits created by the [FETRA]

assessments inure only to the tobacco farmers and not to the general public."  Debtor

Memorandum of Law at 10. [dkt item 19]  In the alternative, Debtor argues that all FETRA

Assessments accrued prepetition "on March 30, 2005," the effective date of FETRA, and

therefore are time barred from administrative status because they accrued prior to the petition

date, and because they do not benefit the estate.  *Id.* at 11.  Debtor also raises a question of

statutory interpretation under the Bankruptcy Code, asserting that if FETRA Assessments

constitute excise taxes under § 507(a)(8), then any postpetition Assessments are "disqualified"

from also being an administrative claim by virtue of § 503(b)(1)(B)(i).  *Id.* at 12.

On January 18, 2012, USDA filed opposition to Debtor's Motion (the "Response"). [dkt

item 23]  USDA's Response asserts that FETRA serves a public purpose, which is "to provide

financial support to enable American tobacco growers, who had become dependent on the price

supports and quotas under the heavily regulated old system, to transition to the free market and

to become more competitive with foreign growers, if they chose to continue growing tobacco, or

to leave if they transitioned to new crops or different jobs."  *Id.* at 2.  USDA argues that FETRA

payments provide financial relief to approximately 450,000 eligible individuals, most of whom are financially distressed small farmers, and create thousands of new jobs. *Id.* at 4. USDA points out that an Assessment can serve a public purpose without providing a universal public benefit. *Id.* at 3. In addition, USDA disputes Debtor's assertions that FETRA Assessments became fixed on the date that the statute took effect, noting that Assessments are determined quarterly based upon each Tobacco Manufacturer's reported sales in the preceding quarter. *Id.* at 5.

On January 30, 2011, Debtor filed a reply in support of its Motion (the "Reply"). [dkt item 24] Debtor points out that USDA does not dispute that $806,527.14 of its Claim represents Assessments for periods more than three years prior to the Petition Date, which are not entitled to priority status under § 507(a)(8)(E) even if the USDA Claim constitutes an excise tax. Reply at ¶ 2. [dkt item 24] With respect to the remaining $490,507.96 balance of USDA's claim, Debtor asserts that this amount is also not entitled to priority status because it "accrued on March 30, 2005" when Debtor states FETRA took effect. *Id.* at ¶ 3. Finally, Debtor argues that FETRA Assessments are not a tax but "an 'earmark' by Congress for the benefit of not the public, but the tobacco farmers," and that FETRA Assessments lack a public purpose because of the negative health effects of using tobacco products. *Id.* at ¶¶ 6-7.

After the filing of these pleadings, the Court took this matter under submission.

<u>Discussion</u>

**I. Standard for Summary Judgment**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP"), incorporated by Bankruptcy Rule 7056(c), summary judgment should be granted to the moving party if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.4 (1986) (quoting FRCP 56(c)) (internal quotation marks omitted).  A movant has the initial burden of establishing the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322-23.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion." *Smith v. Goord*, 2008 WL 902184 *4 (N.D.N.Y. Mar. 31, 2008) (citing *Anderson*, 477 U.S. at 250 n.4).

If the movant meets its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, it must present "significant probative evidence" that a genuine issue of fact exists.  *Anderson*, 477 U.S. at 249 (internal citations and quotation marks omitted).  "There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor." *Cadle Co. v. Newhouse*, 2002 WL 1888716 *4 (S.D.N.Y. 2002) (citing *Anderson*, 477 U.S. at 249); *see also Anderson*, 477 U.S. at 250 (finding that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

"When deciding cross-motions for summary judgment, the standard to be applied 'is the same as that for individual summary judgment motions and a court must consider each motion independent of the other.'"  *RST (2005) Inc. v. Research in Motion Ltd.*, 2008 WL 5416379, at *3 (S.D.N.Y. 2008) (quoting *Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004)); *see*

*In re Citron*, 2010 WL 2978062, at *3-4 (Bankr. E.D.N.Y. July 23, 2010); *In re Zerbo*, 397 B.R.

642, 647-48 (Bankr. E.D.N.Y. 2008).

As noted above, the parties agree that there are no genuine issues of material fact.  *See*

Debtor's Statement Pursuant to Local Bankruptcy Rule 7056-1 at ¶ 8 [dkt item 19]; USDA's

Rule 7056-1 Statement of Undisputed Facts at p.1 [dkt item 17-1].  Thus, this dispute granulates

down to four questions: (1) whether FETRA has a public purpose and therefore FETRA

Assessments constitute excise taxes; (2) when do FETRA Assessments accrue; (3) to what extent

are FETRA Assessments that accrued prepetition entitled to priority status; and (4) whether

postpetition FETRA Assessments are entitled to administrative priority status.

## II.  FETRA Assessments Constitute Excise Taxes under § 507(a)(8)(E)

### A.  Defining "Tax"

The first issue for the Court to determine is whether FETRA Assessments constitute

excise taxes as opposed to regulatory fees for purposes of federal law.  Section 507 of the

Bankruptcy Code lists the order of priority that Congress has accorded to certain claims in

bankruptcy; allowed prepetition unsecured claims of governmental units for excise taxes are

entitled to an eighth level of priority.  Section 507(a) provides that:

> (a) The following expenses and claims have priority in the following order:
> . . .
> (8) Eighth, allowed unsecured claims of governmental units, only to the extent
> that such claims are for –
> . . .
> (E) an excise tax on—
> . . .
>         (ii) if a return is not required, a transaction occurring during the three
> years immediately preceding the date of the filing of the petition[.]

11 U.S.C. § 507(a)(8)(E) (2011).  While the Bankruptcy Code is replete with defined terms,

"tax" and "excise tax" are not among them.  *See* 11 U.S.C. § 101.  Although the statute does not

define "tax," federal case law has provided guidance for determining whether an assessment or required payment is a tax as opposed to a regulatory fee; if a charge is a regulatory fee, it receives no priority and is treated as a general unsecured claim. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 226 (1996).

The United States Supreme Court has defined taxes as "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *City of New York v. Feiring*, 313 U.S. 283, 285 (1941) (internal citations omitted); *see CF & I Fabricators*, 518 U.S. at 224 (1996). "[A] 'tax' under the Bankruptcy Code means anything that functions like a tax, not just anything Congress labeled a 'tax' . . . ." *Seven-Sky v. Holder*, 661 F.3d 1, 6 (D.C. Cir. 2011) (citing *CF & I Fabricators*, 518 U.S. at 219-20). By contrast, a regulatory fee "is incident to a voluntary act, *e.g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340-341 (1974).

Within the realm of taxes is the "excise tax," which courts have defined as "an 'indirect tax, one not directly imposed upon persons or property' and 'one that is imposed on the performance of an act, the engaging in any occupation, or the enjoyment of a privilege.'" *In re Albert Lindley Lee Mem'l Hosp.*, 428 B.R. 283, 295 (Bankr. N.D.N.Y. 2010) (quoting *New Neighborhoods, Inc. v. W. Va. Workers' Comp. Fund*, 886 F.2d 714, 719 (4th Cir. 1989)). Examples of excise taxes include sales taxes, estate and gift taxes, and fuel taxes. *See* 4 COLLIER ON BANKRUPTCY ¶ 507.11[6] (Alan N. Resnick and Henry J. Sommer eds. Matthew Bender

2011).  Courts within the Second Circuit have held that assessments to fund employee retirement

and health plans and unemployment insurance constitute excise taxes.  *See In re Chateaugay

Corp.*, 53 F.3d 478 (2d Cir. 1995) (assessments for retiree health and benefit plans); *In re

Chateaugay Corp.*, 177 B.R. 176 (S.D.N.Y. 1995) (unemployment insurance).

Determining whether assessments are taxes or fees requires the Court to scrutinize the

function and effect of the Assessments.[12]  In *CF & I Fabricators*, the question before the

Supreme Court was whether a ten percent additional charge assessed by the Internal Revenue

Service prepetition upon a Chapter 11 debtor that had underfunded its pension plan constituted

an excise tax for purposes of § 507(a) priority.  518 U.S. at 220, 226.  To determine whether a

particular assessment is a tax, penalty or otherwise, the Court employed a "functional

examination" that looks to "the actual effects of the exaction" and does not rely on the "label

placed on the exaction."  *Id.* at 220-21.  Finding that the ten percent additional charge was

punitive in nature, the Court held that the charge was a penalty but not an excise tax and,

therefore, not entitled to priority under § 507(a).  *Id.* at 226.

Building on these core principals, Courts of Appeals have developed two different but

overlapping tests for determining whether an exaction or assessment is a tax as opposed to a fee.

In *In re Chateaugay Corp.*, the Second Circuit adopted a four-part test set forth by the Ninth

Circuit in *In re Lorber Industries of California.  Chateaugay*, 53 F.3d 478, 498 (2d Cir. 1995)

---

[12]  This Court notes that determining whether a governmental assessment or exaction is a tax or a fee can be a contentious issue that divides courts. *Compare Seven-Sky,* 661 F.3d at 6-7 (finding that the federal Anti-Injunction Act did not apply to exactions labeled "penalties" rather than "taxes" and did not bar the D.C. Circuit from hearing a challenge to the Patient Protection and Affordable Care Act), *and Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 539-40 (6th Cir. 2011) (same), *with Liberty Univ., Inc. v. Geithner*, 2011 WL 3962915, at *5-6 (4th Cir. Sept. 8, 2011) (finding that the Anti-Injunction Act did apply to "penalties" and therefore the court was without jurisdiction to hear a challenge to the Patient Protection and Affordable Care Act), *and Seven-Sky*, 661 F.3d at 22 (Kavanaugh, J. dissenting). The applicability or lack thereof of the Anti-Injunction Act to the Patient Protection and Affordable Care Act is currently before the United States Supreme Court. *See Florida v. HHS*, 648 F.3d 1235 (11th Cir. 2011)*, cert. granted*, 132 S. Ct. 604 (U.S. Nov. 14, 2011).

(quoting *Lorber*, 675 F.2d 1062, 1066 (9th Cir.1982)) (the "*Lorber* Test").[13]   Under the *Lorber*

Test, a governmental charge will be treated as a tax if it is:

> (a)  An involuntary pecuniary burden, regardless of name, laid upon the individuals or property;
>
> (b)  Imposed by, or under authority of, the legislature;
>
> (c)  For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; [and]
>
> (d)  Under the police or taxing power of the state.

*Chateaugay*, 53 F.3d at 498.   In *Chateaugay*, the Second Circuit held that payments that mining

companies were required to make under the federal Coal Industry Retiree Health Benefit Act (the

"Coal Act") to fund health and benefit plans for retired coal miners constituted a tax and

therefore must be accorded priority status under § 507(a).  *Id.*  Applying the *Lorber* Test, the

Second Circuit found that (1) the Coal Act contributions were involuntary; (2) they were

assessed by Congress; (3) they were assessed for the public purpose of protecting the industry-

wide coal miners' health and pension benefit trusts from insolvency; and (4) the contributions

were enacted at least partially as an exercise of Congress' taxing power.  *Id.* at 484, 498.

In arguing that FETRA Assessments constitute excise taxes, USDA proposes that this

Court apply the *Lorber* Test.  USDA Memorandum of Law at 10. [dkt item 17]  Debtor asserts,

however, that this Court should apply a variation on the *Lorber* Test that was set out by the Sixth

Circuit in *In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 341 (6th Cir. 1993) ("*Suburban I*"),

---

[13]  Although *Lorber* and *Chateaugay* were decided prior to the Supreme Court's decision in *CF & I Fabricators*, courts have continued to apply the *Lorber* Test to determine whether an assessment is a tax. *See, e.g.*, *Pension Benefit Guar. Corp. v. CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1297-98 (10th Cir. 1998); *Adventure Resources v. Holland*, 137 F.3d 786, 794 (4th Cir. 1998); *In re Probulk, Inc.* 2010 WL 5376284, at *2 (Bankr. S.D.N.Y. Dec. 23, 2010); *Albert Lindley Lee Mem'l Hosp.*, 428 B.R. at 289-90.

and which was restated in *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 488 (6th Cir. 1994) ("*Suburban II*") (the "*Suburban* Test").[14]  Debtor Memorandum of Law at 8.  [dkt item 19]

Despite their differences over which test should apply, the parties agree that FETRA Assessments are an involuntary pecuniary burden imposed under the legislative authority of the Congress pursuant to its taxing or police powers; thus satisfying three of the four *Chateaugay/Lorber* factors.  With respect to the two additional elements under the *Suburban* Test, USDA asserts that they need not be considered here because the Second Circuit has not adopted these additional elements.  *See Albert Lindley Lee Memorial Hosp.*, 428 B.R. at 290 ("It is noteworthy that the Second Circuit did not reference the *Suburban I* decision . . . nor adopt the analysis employed in *Suburban II* . . . when it issued its [later] decision in *Chateaugay* . . . .") However, this Court does not need to decide whether the two additional *Suburban* factors are applicable in this Circuit, because the parties have conceded that they are not applicable in this case.  *See* USDA Memorandum of Law at 10, note 1 [dkt. item 17] ("there is no need to determine whether the additional *Suburban* elements are applicable because plaintiff does not dispute that they are in any event satisfied here."); Debtor Memorandum of Law at 8 [dkt item 19] ("Although the [FETRA] assessments satisfy five of the six requirements stated above, the

---

[14]  In addition to the four factors in the *Lorber* Test listed above, the *Suburban* Test requires finding:

> (1) that the pecuniary obligation be universally applicable to similarly situated entities; and
> (2) that according priority treatment to the government claim does not disadvantage private creditors with like claims.

*Suburban II*, 36 F.3d at 488. According to the Sixth Circuit, these additional factors were added to avoid "the danger that overemphasis on the 'public purpose' element will eliminate all distinction between 'taxes' and 'fees' or other money owed the Government, enabling the Government to prevail consistently against private creditors with arguably equal claims." *Suburban I*, 998 F.2d 341-42 (holding that unpaid premiums due under Ohio's workers' compensation law were a tax and not a fee, because the payments were compulsory, the compensation program was operated exclusively by the state; the program covered all employees for work-related injuries, and the premiums served a public purpose because injured employees depended on the financial soundness of the workers' compensation fund).

assessments do not satisfy the 'public benefit' prong."). Therefore, the issue as framed by the parties is whether FETRA Assessments effectuate a public purpose.

### B. Case Law Addressing FETRA

The USDA Memorandum of Law identifies three opinions arising out of two cases which, while they do not reach the public purpose question, address whether FETRA Assessments are an unconstitutional taking of property under the Fifth Amendment and whether they violate the Due Process Clause and/or the Equal Protection Clause of the United States Constitution; thus, these cases provide some guidance for this case.[15] USDA Memorandum of Law at 12-13, 15-17. [dkt item 17]

In *Swisher International, Inc. v. Mike Johanns, Secretary of Agriculture*, a manufacturer of cigars and smokeless tobacco products argued that the regulations implementing FETRA violated the Administrative Procedures Act, and that FETRA and its implementing regulations violating the Takings Clause and the Due Process Clause of the Fifth Amendment as well as principles of Equal Protection. 2007 WL 4200816, at *1 (M.D. Fla. Nov. 27, 2007). As part of its Takings Clause analysis, the district court addressed whether FETRA Assessments constitute a regulatory fee or a tax. *Id.*, at *6-8. To determine whether FETRA Assessments are a tax or a fee, the court applied a three-factor test developed by the First Circuit in *San Juan Cellular Telephone Co. v. Public Services Commission of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992), under which a court should consider whether the assessment is "(1) imposed by an agency or the legislature; (2) imposed upon those being regulated or the community as a whole; and, (3) for the purpose of defraying regulatory costs or to raise revenue." *Swisher*, 2007 WL 4200816, at *4 n.9

---

[15]  The Court's own research has revealed approximately twenty published decisions involving various challenges to FETRA. *See, e.g.*, *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010); *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307 (D.D.C. 2009); *In re Evans*, 337 B.R. 551 (Bankr. E.D.N.C. 2005). However, no published decision appears to have squarely held that FETRA Assessments constitute a tax.

(quoting *San Juan Cellular*, 967 F.2d at 685)).  Applying the *San Juan Cellular* Test, the district

court in *Swisher* found that FETRA Assessments are imposed by Congress but only upon a

narrow class of persons, Tobacco Manufacturers, and not on the community as a whole.  *Id.*, at

\*7.  Following other "close cases such as this," the court then turned to the third *San Juan*

*Cellular* factor: whether the fees would be used for defraying regulatory costs or raising revenue.

*Id.*  Calling FETRA a "hybrid," the court determined that the funds raised by FETRA are neither

exclusively for defraying regulatory costs or for raising revenues, but rather, the funds are used

to "dismantle a regulatory system." *Id.*  Because the court found that "FETRA is primarily

concerned with regulation – albeit through the seemingly incongruous aim of aiding in the

transition of a formerly heavily regulated industry to a free market system," the court concluded

that FETRA Assessments are "a fee rather than a tax." *Id.*  Nevertheless, the court held that

there was no Takings Clause violation because a Takings Clause analysis is not appropriate when

the dispute merely involves a government-imposed obligation to pay money.  *Id.*, at \*9.  Further,

the *Swisher* court recognized that "Congress has made clear that FETRA serves the public

purpose of aiding farmers in the difficult and potentially financially ruinous transition to the free

market."  *Id.*, at \*10.[16]

　　　　On appeal, the Eleventh Circuit Court of Appeals agreed that FETRA Assessments do not

violate the Takings Clause and that a Takings Clause analysis is not appropriate for FETRA

Assessments because they are "an obligation imposed by Congress merely to pay money."[17]

*Swisher Int'l, Inc. v. Ed Schafer, Sec'y of Agric.*, 550 F. 3d 1046, 1054-55 (11th Cir. 2008).  In

---

[16]  The district court also concluded that FETRA did not violate Due Process because FETRA was a rational
exercise of Congress' legislative power and because a participant in the tobacco industry might reasonably expect to
be subject to further regulation. *Swisher*, 2007 WL 4200816, at \*13. The district court further concluded that
FETRA did not violate Equal Protection because it was supported by a rational basis and was not arbitrary and
capricious. *Swisher*, 2007 WL 4200816, at \*16.

[17]  The Eleventh Circuit also affirmed as to Due Process and Equal Protection. 550 F. 3d at 1054-55.

addition, the Eleventh Circuit held that FETRA does not impose retroactive obligations on Tobacco Manufacturers; rather, FETRA Assessments are "based upon current participation in the market." *Id.* at 1058. However, the Eleventh Circuit did not reach the question of whether FETRA Assessments constitute taxes as opposed to regulatory fees because that issue was not raised on appeal.[18]

In the final decision cited by USDA, *United States v. Native Wholesale Supply, Co.*, a district court within the Second Circuit was presented with a challenge to FETRA by a cigarette importer that claimed CCC improperly calculated plaintiff's FETRA base period and claimed that FETRA violated the Takings Clause and Due Process Clause. 2011 WL 4704221, at *2 (W.D.N.Y. Oct. 4, 2011). On the question of the proper base period, the court deferred to the agency's interpretation of the statute. *Id.*, at *6 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). The court then cited the Eleventh Circuit's decision in *Swisher* in concluding that "the Takings Clause [analysis] is not appropriate and FETRA is not inconsistent with the Due Process Clause." *Id.*, at *8.[19] However, as with the Eleventh Circuit's decision in *Swisher*, the court in *Native Wholesale* did not reach the question of whether FETRA Assessments constitute taxes or regulatory fees.

Therefore, this Court is presented with just one published decision on the question of whether FETRA Assessments constitute taxes. *See Swisher*, 2007 WL 4200816, at *9-10. Although the district court in *Swisher* held that FETRA Assessments are regulatory fees and not

---

[18]  The Eleventh Circuit's opinion interchangeably refers to the FETRA Assessments as an "excise tax"; 550 F.3d at 1050, 1060; and as "assessments"; *id.* at 1050, 1053, 1056-60; however, the term "fee" or "regulatory fee" appear nowhere in the Eleventh Circuit's decision.

[19]  The *Native Wholesale* court also concluded that FETRA did not violate United States treaties with Native America nations, and the court rejected an argument that another entity, Livingston International, Inc., should have been liable for the FETRA Assessments as that issue was not raised in the administrative hearings. 2011 WL 4704221, at *9-10.

taxes, it did so by applying the *San Juan Cellular* factors for determining whether an agency assessment is an unconstitutional violation of the Takings Clause.  *Id.*, at *6-8.  The court was not faced with the somewhat different question of whether FETRA Assessments constitute excise taxes under the *Lorber* Test.  The *Swisher* district court described its decision as a close case, and the question of whether FETRA Assessments are taxes or fees was not even raised by the parties on appeal.  Because the district court's determination that FETRA Assessments are not taxes was made in the context of a Takings Clause analysis, and because both the district court and Eleventh Circuit rejected the claimed Takings Clause violation as an appropriate means of analyzing FETRA Assessments since they are "an obligation imposed by Congress merely to pay money," *Swisher*, 550 F.3d at 1054, the *Swisher* decisions are not precedential for this case.  *See In re Nicholson*, 435 B.R. 622, 631 (9th Cir. BAP 2010) (citing *Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1471-72* (9th Cir. 1995) and *Wainwright v. Witt*, 469 U.S. 412, 422 (1985)) (discussion that is not essential to a court's holding is not binding or precedential); *see also In re Nandalall*, 434 B.R. 258, 269 n.7 (Bankr. N.D.N.Y. 2010); *In re Franklin Indus. Complex, Inc.*, 377 B.R. 32, 50 n.17 (Bankr. N.D.N.Y. 2007).

## C.  Public Purpose

This Court must therefore determine whether FETRA Assessments constitute excise taxes, a question which, the parties agree, turns on whether FETRA has a "public purpose, including the purposes of defraying expenses of government or undertakings authorized by it." *Chateaugay*, 53 F.3d at 498.

Debtor argues that there is no public purpose to FETRA because FETRA Assessments were created by the USDA, "to benefit tobacco farmers, a particular party in interest, and not the general public."  Debtor Memorandum of Law at 10.  [dkt item 19]  Debtor asserts that the

benefits of FETRA Assessments inure only to U.S. Tobacco Growers that receive the payments and not to the general public, and that the sole purpose of FETRA Assessments is to lower U.S. Tobacco Growers' selling price and to increase their revenues. *Id.* In addition, Debtor contends that a tax cannot achieve a public purpose by stabilizing a single industry, in this case U.S. Tobacco Growers. *Id.* Debtor also points out the lack of a stated public purpose in the statute itself. *Id.* Further, Debtor argues that FETRA cannot have a public purpose because of the negative health effects of tobacco products. *Id.*

USDA counters that Congress had a public purpose in enacting FETRA, which was "to enable tobacco farmers to transition into the free market." USDA Memorandum of Law at 11 (citing legislative history). [dkt item 17] USDA notes that prior to the passage of FETRA, U.S. Tobacco Growers were subject to heavy regulation resulting from a Depression-era program of tobacco quotas and price controls. *Id.* Because of artificially inflated prices for U.S.-grown tobacco, U.S. Tobacco Growers suffered financial hardship and thousands of jobs were lost, impacting local, regional, and state economies. *Id.* at 12. USDA argues that the payments to U.S. Tobacco Growers that are funded by FETRA Assessments will enable those Growers to either become more competitive with foreign growers or transition to new crops or different jobs, and that the Assessments provide financial relief to approximately 450,000 individuals. *Id.* at 12. USDA also asserts that the Eleventh Circuit recognized FETRA's public purpose to "transition to a free market system [that] would benefit all current and future tobacco manufacturers and importers . . . all of whom would benefit from the transition to a free market system." *Id.* at 12-13 (quoting *Swisher*, 550 F.3d at 1058-59).

With respect to Debtor's arguments, USDA asserts that even if FETRA only benefits U.S. Tobacco Growers, that still serves a public purpose by making the U.S. Growers more

competitive with foreign tobacco growers.  *Id.* at 13.  USDA also argues that stabilizing a specific industry is a public purpose, as demonstrated by the case law upholding payments required under the Coal Act to stabilize coal industry retiree health and benefits plans.  *Id.* at 13. USDA relies on, among other cases, *In re Sunnyside Coal Co.*, 146 F.3d 1273, 1277 (10th Cir. 1998), which found a public purpose in the Coal Act's preserving the nation's coal industry by promoting labor peace and protecting employees' health.  *Id.* at 13.  Further, USDA notes that courts have held that payments required to be made to the government that were earmarked to support a specific industry have been found to be taxes.  *Id.* at 14-15; *see Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011) (which found that a three percent state assessment on casinos that was earmarked to subsidize racetracks constituted a tax). Additionally, USDA points out that the district court in *Swisher*, while concluding that FETRA Assessments were fees for purposes of the Takings Clause, did find that FETRA serves "the public purpose of aiding farmers in the difficult and potentially financially ruinous transition to the free market."  USDA Memorandum of Law at 17; *see Swisher*, 2007 WL 4200816, at *10.

In considering whether FETRA has a public purpose, this Court does have some concerns regarding the legislation itself.  First, it appears that CCC makes annual payments to U.S. Tobacco Growers which are not based upon the amount of Assessments that have been collected from Tobacco Manufacturers.  CCC has apparently made payments to approximately 450,000 U.S. Tobacco Growers since 2005 without regard to the level at which FETRA Assessments have actually been paid.  As a result, the U.S. government is potentially left unreimbursed for millions and millions of dollars that it has already paid to U.S. Tobacco Growers which have not been collected from Tobacco Manufacturers.  The prospect of nonpayment or substantially delayed payment of Assessments and limited enforcement mechanisms are troubling given that

USDA cites as support for FETRA's public purpose that FETRA Assessments "raise revenue which would otherwise be paid out of government funds." USDA Memorandum of Law at 17.[20]

Second, USDA has not addressed a vagueness in the statute and regulations as to how the aggregate $10.14 billion in Assessments is to be allocated by year or by quarter. It appears that CCC is given broad discretion to determine how much of the $10.14 billion to assess or to collect in any given year or quarter.[21]

Finally, as Debtor somewhat ironically points out, tobacco is a cancer-causing product. Reply at ¶ 6. [dkt item 24] As a result, it might seem antithetical to find that legislation that subsidizes tobacco growers and stabilizes the tobacco industry serves a public purpose or benefit, given the widely known public health dangers of tobacco products.

Nevertheless, this Court recognizes that Congress expressed a public benefit to unwinding the system of quotas and price controls that apparently made approximately 450,000 U.S. Tobacco Growers dependent upon subsidies for growing tobacco, and that CCC payments are meant to wean these growers off those subsidies as they transition to a free market. As the Eleventh Circuit pointed out, this benefits not only U.S. Tobacco Growers, but also Tobacco Manufacturers, like Debtor, and the industry as a whole.

---

[20] Although USDA did not cite to any specific penalty for or enforcement mechanism when a Tobacco Manufacturer simply does not pay FETRA Assessments, it appears that USDA has statutory authority to commence a "lawsuit as an enforcement action under FETRA and pursuant to 15 U.S.C. § 714b(c), which authorizes the CCC to 'sue and be sued.'" *United States v. Rouseco, Inc.*, 2012 WL 525537 (E.D.N.C. Feb. 16, 2012). Further, USDA does not assert that CCC could impose a lien upon any tobacco products imported by a foreign producer as a means to collect unpaid Assessments, or that CCC could direct U.S. Customs and Border Protection to delay release of imported tobacco products due to nonpayment of Assessments.

[21] The gross amount of annual payments to domestic tobacco growers is not set out in the statute or the regulations. However, USDA believes the payments are approximately $1 billion per year. *See* Press Release, USDA, (Nov. 18, 2011)(http://www.fsa.usda.gov/FSA/printapp?fileName=nr_20111118_rel_0164.html&newsType=newsrel); Determination of the Administrator of the Farm Service Agency and Executive Vice President of the Commodity Credit Corporation Regarding the Current "Step A" and "Step B" Assessment Methods in the Tobacco Transition Payment Program, Bruce Nelson, Administrator, Farm Service Agency and Executive Vice President, Commodity Credit Corporation (Nov. 16, 2011) (http://www.fsa.usda.gov/Internet/FSA_File/tobacco_determ_11162011.pdf).

Therefore, despite some reservations expressed above, this Court concludes that FETRA has a public purpose as follows: (1) stabilizing U.S. Tobacco Growers and the tobacco industry as a whole during the ten-year period of transition from a heavily regulated industry to a free market; (2) enabling U.S. Tobacco Growers that opt not to complete in the free market to grow other products or find alternative jobs; (3) making the tobacco industry as a whole more competitive and less dependent on government subsidies and controls; and (4) defraying the expenses of the Tobacco Transition Payment Program through the Assessments.  As a result, this Court holds that FETRA Assessments satisfy the public purpose element of the *Lorber* Test as adopted by the Second Circuit in *Chateaugay*.

In function and effect, FETRA Assessments represent excise taxes on Debtor's business of importing and distributing tobacco products.  Therefore, this Court concludes that FETRA Assessments constitute "excise taxes" for purposes of priority under § 507(a)(8)(E)(ii).

### III.  When Do FETRA Assessments Accrue

Having found that FETRA Assessments are excise taxes and entitled to eighth priority status under § 507(a)(8)(E)(ii) for prepetition Assessments, the next question is when do FETRA Assessments accrue.  The answer to this question is critical because § 507(a)(8)(E)(ii) only permits a priority claim for "an excise tax on . . . a transaction occurring during the three years immediately preceding the date of the filing of the petition."[22]

For purposes of § 507(a)(8) and § 503(b) (which is discussed in Part IV below), most courts have held that "a tax is incurred when it accrues and becomes a fixed liability . . . .  A tax

---

[22]  The parties agree that Debtor, as a Tobacco Manufacturer, was not required to file returns under FETRA. USDA Memorandum of Law at 17 [dkt item 17]; Reply at ¶ 2 [dkt item 24]. Therefore, § 507(a)(8)(E)(i) is not applicable in this case. Further, as noted above, USDA has conceded that FETRA Assessments that accrued during the period of March 30, 2005 to June 24, 2007, which is more than three years prepetition, cannot be treated as a priority claim under § 507(a)(8)(E). Response at 1. [dkt item 23]

obligation accrues when the event triggering liability occurs." *In re Federated Dep't Stores, Inc.*, 270 F.3d 994, 1001 (6th Cir. 2001); *see In re Soltan*, 234 B.R. 260, 269-71 (Bankr. E.D.N.Y. 1999); *In re Bondi's Valu-King, Inc.*, 126 B.R. 47 (N.D. Ohio 1991).

Debtor argues that no part of USDA's claim for prepetition unpaid FETRA Assessments is entitled to priority status under § 507(a)(8)(E)(ii) because all FETRA Assessments accrued "on March 30, 2005," the date that Debtor states that FETRA became effective.  Reply at ¶ 3. [dkt item 24]  Debtor asserts that FETRA "fixed the total amount to be paid as assessments as of its effective date." *Id.*  Therefore, Debtor argues, USDA's entire claim accrued more than three years prior to the Petition Date, and no part of USDA's claim is entitled to priority status under § 507(a)(8)(E)(ii). *Id.*

As a preliminary matter, the Court notes that FETRA became effective on October 22, 2004, and imposed retroactive obligations commencing October 1, 2004. *See* Pub. L. No. 108-357, Title VI, § 643, 118 Stat. 1536 (Oct. 22, 2004) (codified at 7 U.S.C. § 518, *et seq.*); *United States v. Leader Tobacco Co.*, 2010 WL 3701581, at *4 (S.D. Fla. Sept. 15, 2010) (discussing FETRA's retroactive effect).  Regardless of whether FETRA Assessments began to accrue in October 2004 or March 2005, both dates are outside the three-year period prior to the Petition Date.  The critical question, then, is when do FETRA Assessments accrue.

USDA argues that FETRA Assessments become fixed and accrued "each quarter when USDA sends out invoices for payment to the Debtor and to all other tobacco manufacturers and importers."  USDA Memorandum of Law at 17.  [dkt item 17]  According to USDA, these invoices are sent to Tobacco Manufacturers each quarter from June 2005 to June 2014, and "the quarterly invoice is for transactions covering the previous quarter" based on information reported by that Tobacco Manufacturer. *Id.* at 18.  Thus, USDA argues, Debtor's obligation to pay

FETRA Assessments "became fixed (indeed, could only be known) and accrued each quarter when USDA sent invoices for payment to Debtor and to all other tobacco manufacturers and importers." *Id.* at 17. Additionally, USDA asserts that "Plaintiff's view would lead to the absurd result that all FETRA Assessments due in the 10 years in which FETRA is effective would have been due and payable in one lump sum on March 30, 2005." Response at 5. [dkt item 23]

The undisputed facts in this case show that all Tobacco Manufacturers, including Debtor, are liable for FETRA Assessments by virtue of removing their tobacco products from inventory or customs and making them available for sale in the United States. Each quarter, CCC calculates the liability for every Tobacco Manufacturer based upon the amount of tobacco products that the Tobacco Manufacturer took out of inventory or had released from customs in the previous quarter. Therefore, the precise amount that the Debtor or any other Tobacco Manufacturer owes for a given quarter cannot be known until CCC makes the calculation after the close of the quarter. If, however, Debtor were to alter the type of tobacco products that it imports or the amount it imports, Debtor's FETRA Assessments would necessarily change for future quarters. Although the total obligation of all Tobacco Manufacturers was fixed and capped under FETRA at $10.14 billion on the date of enactment, this aggregate amount is assessed and apportioned quarterly on all Tobacco Manufacturers based upon the amount of tobacco products "removed" in the prior quarter. 7 U.S.C. § 518f. Further, as the Eleventh Circuit recognized in *Swisher*, FETRA Assessments are not retroactive, but are based upon a Tobacco Manufacturer's "current participation in the market." 550 F.3d at 1058. Therefore, this Court rejects Debtor's argument that all FETRA Assessments accrued on the effective date of the statute.

However, the Court also does not agree with the USDA's assertion that Debtor's liability

under FETRA accrues upon the issuance of quarterly invoices by CCC.  Rather, the language of

the statute and the regulations indicates that liability attaches when a Tobacco Manufacturer

"removes" its tobacco products and makes them available for marketing and sale in the United

States.  *See* 7 U.S.C. § 518d(b); 26 U.S.C. §§ 5702(j); 7 C.F.R. 1463.7.  Therefore, under the

statute, the transaction giving rise to liability for FETRA Assessments is the "removal" of

tobacco products from customs or inventory and making them available for distribution in the

U.S. market.  While the precise amount of the Assessments for each Tobacco Manufacturer is

not known until CCC issues invoices after the quarter close, the actual liability for those

Assessments arises when tobacco products are "removed"; this removal into U.S. commerce is

the transaction contemplated by 11 U.S.C. § 507(a)(8)(E)(ii).  As a result, CCC's ministerial act

of issuing quarterly invoices does not trigger Debtor's liability under FETRA, it merely

quantifies it.[23]

Therefore, this Court holds that USDA is entitled to a priority claim under 11 U.S.C.

§ 507(a)(8)(E)(ii) for Assessments on all Debtor's tobacco products that were released from

customs in the "three years immediately preceding the date of the filing of the petition," that is

June 25, 2007 to June 24, 2010.  Any FETRA Assessments on Debtor's tobacco products that

were released from customs prior to June 25, 2007 are not entitled to priority under

§ 507(a)(8)(E)(ii) and therefore shall be treated as a general unsecured claim during the

pendency of Debtor's main bankruptcy case.

---

[23]  Numerous courts have recognized in other contexts that priority under § 507(a)(8) is tied to the transaction date and not to the date of invoicing of a charge. *See, e.g.*, *Federated Dep't Stores*, 270 F.3d at 1000 (property taxes that accrued prepetition but were invoiced postpetition); *In re United Healthcare Sys., Inc.*, 282 B.R. 330, 342 (Bankr. D.N.J. 2002) (liability for unreimbursed unemployment insurance arose from the dates of employment); *Bondi's Valu-King*, 126 B.R. at 47 (liability for income tax arises when "all the acts necessary to create the tax liability in question occurred" not when payment was due).

## IV. Administrative Claim for Postpetition FETRA Assessments

Having found that USDA is entitled to a priority claim for prepetition FETRA Assessments arising from tobacco products that Debtor "removed" into U.S. commerce during the three years immediately preceding the Petition Date, the Court next turns to the treatment of postpetition FETRA Assessments. Although USDA has not yet filed a proof of claim for postpetition FETRA Assessments, Debtor's Complaint and Motion for Summary Judgment raise various objections and seek declaratory relief as to any potential claim for postpetition Assessments, which the Court will address in turn.[24] First, Debtor argues that postpetition FETRA Assessments should not be accorded administrative priority status under § 503(b)(1) because the Assessments were fixed prepetition when FETRA became effective. This Court has already rejected that argument. Second, Debtor asserts that postpetition FETRA Assessments are not an administrative claim under § 503(b)(1)(A) because they do no benefit the estate. And third, Debtor argues that any assessment that is found to be an excise tax and entitled to priority under § 507(a)(8) is "disqualified" from also being a postpetition administrative claim under § 503(b)(1)(B). Debtor Memorandum of Law at 10-12. [dkt item 19]

Section 503(b) lists nine nonexclusive categories of claims that are entitled to administrative claim status and that are to be paid on a second priority basis under § 507(a)(2). *See* 4 COLLIER ON BANKRUPTCY ¶ 503.05. Included in the list in § 503(b) are:

(1)(A) the actual, necessary costs and expenses of preserving the estate . . . ; [and]

(B) any tax--

(i) incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, *except a tax of a kind specified in section 507(a)(8) of this title* . . . .

---

[24] The final determination of whether any filed claim for FETRA Assessments that accrued postpetition is or is not an administrative claim, and to what extent, cannot be made until such claim has actually been filed.

11 U.S.C. § 503(b)(1) (emphasis added).

Debtor argues that any postpetition FETRA Assessments cannot constitute an administrative claim under § 503(b)(1)(A) because they do not benefit Debtor or help to preserve its estate.  Section 503(b)(1)(A) grants an administrative claim for "the actual, necessary costs and expenses of preserving the estate."  To constitute an administrative claim under § 503(b)(1)(A), a claim must both arise from a transaction with the bankruptcy estate and directly and substantially benefit the estate.  *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007); *see In re Eagle-Picher Indus.*, 447 F.3d 461, 464 (6th Cir. 2006); *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984); 4 COLLIER ON BANKRUPTCY ¶ 503.06[3].  In this case, Debtor does not dispute that postpetition FETRA Assessments arise from a transaction between USDA and Debtor's estate; rather, Debtor argues that FETRA Assessments do not benefit the estate, but actually harm it, by increasing the cost of Debtor's discount and generic cigarettes, thus driving away customers.  Debtor Memorandum of Law at 11.  [dkt item 19]

However, the Court does not believe it is necessary to address whether USDA may have a claim under § 503(b)(1)(A), because § 503(b)(1)(B) specifically authorizes an administrative claim for "any tax – incurred by the estate . . . except a tax of a kind specified in section 507(a)(8)."  As discussed in Part II above, this Court has determined that FETRA Assessments constitute excise taxes.  Because Congress has expressly provided for administrative claims for certain taxes under § 503(b)(1)(B), this Court finds that § 503(b)(1)(B) is the appropriate provision for analyzing a claim for postpetition FETRA Assessments, and it is unnecessary to analyze such a claim under the general "costs and expenses" provision in § 503(b)(1)(A).[25]

---

[25]  Section 503(b) provides a nonexclusive list of categories of administrative claims and provides different treatment depending on the category. For example, different types of compensation are treated differently depending upon into which category in § 503(b) they fit, and compensation is variously addressed by § 503(b)(1)(A), (b)(2),

Debtor next argues that if the Court finds under FETRA that USDA has any allowed postpetition claim for excise taxes, "those claims should be classified as general unsecured claims because § 503(b)(1)(B) does now allow Excise Taxes to have administrative status." Complaint at 10 [dkt item 1]; *see* Debtor Memorandum of Law at 12. [dkt item 19]  Section 503(b)(1)(B) authorizes an administrative claim for taxes "incurred by the estate, whether secured or unsecured . . . except a tax of a kind specified in section 507(a)(8) of this title."  For a tax claimant to be entitled to an administrative claim, the tax must have been incurred by the estate and not by the debtor prepetition.  *In re United Healthcare Sys., Inc.*, 282 B.R. 330, 342 (Bankr. D.N.J. 2002); *In re Boston Reg'l Med. Ctr.*, 256 B.R. 212 (Bankr. D. Mass. 2000).  Thus, a claim for an excise tax is only entitled to administrative status if the transaction on which the claim is based occurred postpetition and the tax was incurred by the estate.

In *United Healthcare Systems*, the State of New Jersey filed a proof of claim for amounts the state paid to debtor's employees pre- and postpetition as unemployment insurance and disability benefits, but for which the debtor had failed to reimburse the state.  *Id.* at 333.  The court found that although the state made payments to the debtor's employees both pre- and postpetition, the employment that gave rise to the state's claim and the base period under which the state calculated the benefits each fell within the prepetition period.  *Id.* at 342.  Because all the transactions that gave rise to the state's claim occurred prepetition, the state was entitled to a priority claim under § 507(a)(8)(E), but not an administrative claim under § 503(b)(1)(B).

In the present case, Debtor argues that once this Court has determined that an assessment is entitled to priority under § 507(a)(8)(E), it is "disqualified" from administrative status under § 503(b)(1)(B).  Debtor Memorandum of Law at 12.  [dkt item 19]  In support of its argument,

---

(b)(4) and (b)(5), some of which is limited to "actual and necessary" compensation, while other forms of compensation must be "reasonable."

Debtor points to the language in § 503(b)(1)(B)(i) which carves out of administrative claims "a tax of a kind specified in section 507(a)(8) of this title." While Debtor's argument is novel, it suffers from a fatal flaw. As USDA points out, § 507(a)(8)(E)(ii) only applies to excise taxes that accrue within the three years *prior* to the petition date. USDA Memorandum of Law at 20. [dkt item 17] Therefore, any FETRA Assessments that accrue postpetition do not satisfy the definition in § 507(a)(8)(E)(ii) because they accrue *after* the petition date. Debtor takes an either-or approach, arguing that an assessment, whenever it accrues, can only be either an eighth priority excise tax under § 507(a)(8) or an administrative claim under § 503(b)(1)(B), but not both. However, Debtor's argument ignores the very situation that this case presents: FETRA Assessments, as an excise tax, accrued prepetition when they were assessed against Debtor's tobacco products that were released from customs prior to the Petition Date, and FETRA Assessments continue to accrue postpetition each time Debtor's tobacco products clear customs after the Petition Date while Debtor operates its business as a debtor-in-possession. Therefore, this case is distinguishable from *United Healthcare Systems*, because Debtor continues to engage in transactions postpetition that give rise to new Assessments for which Debtor is liable as a debtor-in-possession.

Debtor's reliance on the Sixth Circuit's decision in *Federated Department Stores*, 270 F.3d at 1000, is misplaced. That decision stated that "[i]f a tax qualifies for the eighth priority under § 507(a)(8), it is disqualified from the first priority accorded to administrative expenses." *Id.* However, this broad language is tempered by the facts of *Federated*, which involved a single claim for real property taxes where the value and taxability of the property were determined prepetition but where the taxes accrued postpetition. *Id.* at 1005-06 (finding property taxes that accrued postpetition were entitled to administrative priority under § 503(b)(1)(B)). That

situation is similar to the prepetition excise tax in *United Healthcare Systems.* 282 B.R. at 342; *see also* 4 COLLIER ON BANKRUPTCY ¶ 503.07[2][b].  Nevertheless, "[a]n excise tax will be entitled to administrative expense status if the transaction, event or occurrence on which the tax is based occurs *postpetition* and the tax is thus incurred by the estate."  4 COLLIER ON BANKRUPTCY ¶ 503.07[2][e] (emphasis added); *see In re Probulk Inc.*, 2010 WL 5376284, at *4 (Bankr. S.D.N.Y. Dec. 23, 2010) (granting eighth priority status under § 507(a)(8)(B) to claim for property taxes incurred prepetition and administrative claim status under § 503(b)(1)(B) for property taxes incurred postpetition).

Debtor is correct that FETRA Assessments for tobacco products that were released from customs prepetition are not entitled to administrative status because of the carve out in § 503(b)(1)(B)(i).[26]  However, Debtor is incorrect in arguing that § 507(a)(8)(E)(ii) and § 503(b)(1)(B) present an either-or option for all FETRA Assessments.  Rather, §§ 507(a)(8)(E)(ii) and 503(b)(1)(B) are complementary, with § 507(a)(8)(E)(ii) providing priority status to claims for prepetition excise taxes and § 503(b)(1)(B) authorizing administrative claims for postpetition taxes, including excise taxes that accrue postpetition. Here, FETRA Assessments for tobacco products released from customs postpetition are entitled to an administrative claim under § 503(b)(1)(B)(i) because such a claim represents "any tax – incurred by the estate" in continuing to operate its tobacco importing and distribution business as a debtor in possession under § 503(b)(1)(B).  Therefore, this Court finds that USDA is entitled to

---

[26]  As the Court has previously held, such prepetition FETRA Assessments are entitled to priority status under § 507(a)(8)(E)(ii) to the extent they accrued within the three year period immediately preceding the Petition Date.

file an administrative claim under § 503(b)(1)(B) for FETRA Assessments on Debtor's tobacco products that were released from customs on or after the Petition Date of June 25, 2010.[27]

## Conclusion

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, incorporated by Rule 7056(c) of the Federal Rules of Bankruptcy Procedure, this Court concludes that there is no genuine issue as to any material fact in this adversary proceeding.  For the reasons stated above, Debtor and USDA are each entitled to partial summary judgment as follows:

1.      Debtor's first cause of action, asserting that FETRA Assessments are not a tax because they lack a public purpose, is denied.

2.      Debtor's second cause of action, asserting that if FETRA Assessments are taxes, then they should be deemed excise taxes under 11 U.S.C. § 507(a)(8)(E), is granted as set forth herein.  USDA is entitled to a priority claim for FETRA Assessments on Debtor's tobacco products that were released from customs between June 25, 2007 and June 24, 2010, the three years immediately preceding the Petition Date.  Any Assessments for tobacco products that were released from customs on or prior to June 24, 2007 shall be treated as a general unsecured claim during the pendency of Debtor's main bankruptcy case.

3.      Debtor's third cause of action, asserting that FETRA Assessments should not be accorded administrative status under § 503(b)(1) because they were fixed on the effective date of the legislation is denied.

---

[27]  The analysis to determine which FETRA Assessments accrued prepetition and which Assessments accrued postpetition is the same analysis that the Court employed in Part III above. FETRA Assessments accrued prepetition to the extent that they are Assessments on Debtor's tobacco products that were released from customs on or before June 24, 2010, the Petition Date. Postpetition FETRA Assessments are those that were assessed on Debtor's tobacco products that were released from customs on or after June 25, 2010. Further, neither party raised the impact, if any, of 11 U.S.C. § 502(i); as such, this Court need not and does not reach that issue.

4.      And Debtor's fourth cause of action, asserting that any allowed claim for postpetition FETRA Assessments should not be afforded administrative status under § 503(b)(1)(A) or (B), is denied; provided however, that the Court makes no determination as to whether USDA is entitled to an administrative claim because no such claim has yet been filed in the main bankruptcy case.

Therefore, within sixty (60) days from the date of this Memorandum Opinion, USDA is directed to:  (1) file an amended proof of claim reflecting the amount of unpaid prepetition FETRA Assessments on Debtor's tobacco products that were released from customs during the three-year period prior to the Petition Date of June 25, 2010 and which are entitled to priority status under § 507(a)(8)(E)(ii); and (2) file a claim for postpetition FETRA Assessments that accrued on or after the Petition Date of June 25, 2010 and through December 31, 2011.

Debtor shall have thirty (30) days to object to either or both of such claims.

USDA may subsequently amend its postpetition administrative claim to include Assessments that accrued on or after January 1, 2012, and prior to the effective date of any plan confirmed in Debtor's bankruptcy case, unless otherwise ordered by this Court.

This Court shall conduct a hearing, if necessary, to liquidate the respective unsecured, priority, and administrative claims of USDA.  Because such claims shall be filed in the main case, and in order to render a final judgment in this adversary proceeding, any objection by Debtor shall be filed and heard in the main bankruptcy case and determined consistent with this Memorandum Opinion.

An Order and Final Judgment in conformity herewith shall be issued.



Dated: April 6, 2012
    Central Islip, New York

                                   **Alan S. Trust**
                         **United States Bankruptcy Judge**